NICHOLAS NARDUCCI,                  )
                                    )
                Plaintiff,          )
                                    )
    v.                              )    No.  01 C 1425
                                    )
VILLAGE OF BELLWOOD, et al.,        )
                                    )
                Defendant.          )

## MEMORANDUM OPINION AND ORDER

Nicholas Narducci ("Narducci") has brought a four-count
class action Complaint against the Village of Bellwood
("Bellwood" or "Village"), Bellwood's Police Chief Gregory Moore
("Moore"), Bellwood's Mayor Donald Lemm ("Lemm") and Unknown
Trustees and Employees of Bellwood, charging them with violations
of the Fourth Amendment,[1] of Title III of the Omnibus Crime
Control and Safe Streets Act of 1968 ("Title III"), of the
Illinois Eavesdropping Act ("Eavesdropping Act") and of the
Illinois common law duty to refrain from unlawful intrusion into
the seclusion of another. After this Court had granted class
certification under Fed. R. Civ. P. ("Rule") 23 and dismissed
Narducci's Title III claim against Bellwood, all defendants filed

---

[1] As this Court has frequently remarked, precision would
require all such constitutional claims against "state actors" to
be labeled solely in Fourteenth Amendment terms. As a matter of
convenience (and to assist in the exposition of due process
claims that draw their substance from the Bill of Rights), this
opinion will follow the universal practice of citing instead to
the underlying Bill of Rights provision, even though its
incorporation by the Fourteenth Amendment is what Narducci really
invokes.

a Rule 56 motion for summary judgment on the remaining claims. For the reasons articulated below, that motion is denied in part and granted in part.

## Summary Judgment Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).[2] For that purpose courts "consider the evidentiary record in the light most favorable to the nonmoving party...and draw all reasonable inferences in his favor" (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate an issue of triable fact" (id.). Ultimately summary judgment is appropriate only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

---

[2] To that end this District Court's Local Rule ("LR") 56.1 calls for evidentiary statements by the movant and itemized responses by the nonmovant--in each case with record citations--to highlight the existence or nonexistence of factual disputes. This opinion cites to defendants' LR 56.1(a)(3) statement as "D. St. ¶--," to Narducci's LR 56.1(b)(3)(A) responsive statement as "N. St. ¶--" and to Narducci's LR 56.1(b)(3)(B) statement of additional facts as "N. Add. St. ¶--." Each side's initial memorandum ("Mem.") will use the same "D." and "N." abbreviations, with "D. R. Mem." denoting defendants' reply memorandum. All depositions are cited "Dep. ¶--."

2

What follows is a summary of the facts viewed in the light most favorable to Narducci, but only so long as those facts are supported by record evidence.[3]

## Background

Bellwood is an incorporated village in Cook County, Illinois. Its day to day operations are overseen by a Mayor acting much "like a CEO" (D. St. ¶120), while policy is set by both a six-member Board of Trustees ("Board") and the Mayor, who serves as Board President (id. ¶¶118-19, 120, 122). Beneath the Mayor and the Board, Bellwood's governance is divided into various departments such as the Fire, Police and Finance Departments, each with its own head (id. ¶¶120, 125, 137). Each department head reports to the Mayor, who has the ultimate

---

[3] While properly disputed facts must be viewed in his favor, Narducci has failed to adduce adequate support for his denials of some of defendants' LR 56.1 statements. Rather than providing "specific references to the affidavits, parts of the record, and other supporting materials" upon which a given denial relies (as LR 56.1(b)(3)(A) requires), sometimes Narducci either cites materials that do not actually refute a claim (see, e.g., N. St. ¶¶46, 54) or simply fails to cite anything at all (see, e.g., N. St. ¶¶61-63). Such cases as Ammons v. Aramark Uniform Servs. Inc., 368 F.3d 809, 817-18 (7th Cir. 2004) have made clear that district courts are entitled to strict adherence to LR 56.1 and may penalize violations by disregarding a party's noncompliant factual statements or by simply adopting the opposition's version. Hence all of defendants' factual assertions that Narducci has thus failed to contest properly have been deemed admitted for present purposes (Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003)). But Narducci has not been similarly penalized where his denials do not cite directly to the supporting materials, but refer instead to paragraphs of his own LR 56.1(b)(3)(B) statement that in turn cite supportive portions of the record (see, e.g., N. St. ¶¶54, 57, 58).

3

authority to direct and supervise them, including veto power over changes they might otherwise institute in operating procedures or policies (id. ¶¶123-25).

In the Finance Department the Village comptroller serves as department head, and the department is further overseen by a Finance Committee, which comprises a chairman and two rotating members, all drawn from the Board and appointed at the Mayor's discretion (D. St. ¶¶31, 88-89, 138; N. Add. St. ¶168). Some Finance Department policies and procedures can be approved by the Mayor alone, while others such as "budgetary things" must be brought before the Board (D. St. ¶¶141-44).

Board meetings are held twice a month (D. St. ¶89), often preceded by informal "pre-board meetings" among the Board, the Mayor, the Village attorney and the Village clerk (id. ¶¶131, 133). Those informal sessions are normally just "preparatory" meetings used to clarify agenda items, and no votes are taken or formal approvals given until the formal meeting (id. ¶134). In at least some instances, however, Village policies are set during the "pre-board meetings" (id. ¶109; N. Add. St. ¶¶166-67).

In 1990 Bellwood began to operate a 911 emergency phone system, overseen by the Bellwood Emergency Telephone System Board ("Emergency Board")(Gary Modrow ("Modrow") Dep. ¶¶48-49). Phone calls on the lines attached to the emergency system were recorded, with the recording equipment being kept in the Police

4

Department and managed by the "service commander" (N. Add. St. ¶¶31-32).

In 1993 Joe Lagen ("Lagen") was Bellwood's comptroller (D. St. ¶30), Robert Frascone ("Frascone") was its Chief of Police (N. Add. St. ¶147), Paul Keller ("Keller") was a trustee and served as chair of the Finance Committee (D. St. ¶¶84, 94), Modrow was the Police Department's service commander (N. Add. St. ¶34) and Lemm began to serve his first term as Mayor (D. St. ¶117). That cast of characters was in place when, sometime before January 4, 1994, Finance employees began to be threatened by irate customers (D. St. ¶¶47-52). In response Lagen came to a "pre-board" meeting to propose that calls on the Finance Department lines also be recorded (id. ¶¶97, 101; N. Add. St. ¶173). Lagen added as a secondary reason that "employees in the finance department were on the phone too much making personal calls" (D. St. ¶54). Lemm and the entire Board, among others, were present at that meeting (N. Add. St. ¶174). There the Board authorized Lagen to carry out the proposed recording of calls (D. St. ¶¶108-110; N. Add. St. ¶179). Lemm also approved the plan (D. St. ¶171) and also supported the taping, at least in part because his office had received complaints about disrespectful and unprofessional behavior by Finance Department employees (id. ¶¶157-59).

Next the Board requested that the "Emergency Board" connect

5

the Finance Department lines to the 911 recorder, and the
Emergency Board approved that request (N. Add. St. ¶¶68-69).
Lagen then had his secretary send Modrow a January 4, 1994 memo
instructing Modrow to begin recording five specific Finance
Department lines (D. St. ¶¶65-66). Within 30 days the lines were
connected to the 911 recorder overseen by Modrow (id. ¶59; N.
Add. St. ¶¶63-65). No notice of the recordings was posted on or
near the phones, and while initially there may have been an
audible beep on the recorded lines, it was eventually removed and
Narducci never heard one (N. Add. St. ¶¶19, 50, 78, 159, 181,
203). No one was assigned to monitor those recordings, and Lagen
himself never listened to any of them (D. St. ¶¶61-62). Nor did
Lemm ever follow up with Lagen or anyone else as to the
effectiveness of the recordings (id. ¶179).

In March 1996 Moore replaced Frascone as Police Chief (D.
St. ¶257). As Chief Moore had the power to "enact police
policies and procedures" and to instruct Police Department
employees to do specific tasks (N. Add. St. ¶¶33, 38). At some
point before taking office, Moore had been told that Finance
Department phone calls were being recorded (D. St. ¶267). Once
he became Chief, even though he was unaware of any warrant having
been obtained, he took no steps to verify that such taping was
going on, nor did he act to stop the taping until instructed to
do so by the comptroller (id. ¶¶270, 286; N. Add. St. ¶36).

6

While Lemm and Frascone claim that Moore had the power to stop the taping (N. Add. St. ¶¶109, 157), Moore contends that he did not (D. St. ¶¶274, 280-81).[4]

In 1997 or 1998 Narducci replaced Lagen as Bellwood's comptroller (D. St. ¶¶1-2). During Narducci's tenure he received no complaints of rude or unprofessional behavior by Finance Department employees, nor were there any reports of threats (N. Add. St. ¶¶23-25). Narducci served as an independent contractor and worked at Bellwood two to three days a week, making phone calls from "wherever there was an open desk" (D. St. ¶¶1, 5-6). In addition to Bellwood-related calls, Narducci would also make private calls--including calls conducting confidential business with other villages for which he worked--using Finance Department phones as well as his cell phone (id. ¶¶14, 18; N. Add. St. ¶11). Narducci would generally make those calls in the "open area" of the Finance Department (D. St. ¶18), but when making a confidential call he would move to a less congested area to ensure the privacy of his conversation (Narducci Dep. 58-59).

Narducci first became aware that calls on the Finance Department's phones were being recorded during a meeting with

---

[4] There is no single answer as to which of those versions, each supported by the record, is most advantageous to Narducci. For some claims it will be better for Narducci if Moore had the authority to stop the taping, while for others it will be better if he did not. This opinion will adjust its factual assumptions accordingly in the legal analysis that follows.

7

Modrow and Moore, among others, on February 28, 2000 (D. St. ¶¶7-9). After that meeting Narducci informed two trustees that he believed the taping was illegal, notified the State's Attorney and the FBI and wrote a March 1, 2000 memo to Moore directing him to stop the recording (N. Add. St. ¶¶10, 13-14). In the meantime Narducci continued to use those Finance Department phones for Bellwood business, but he used his cell phone for all confidential calls (D. St. ¶¶19-20). When Narducci informed his other municipal clients that some of their phone calls had been recorded, many of those clients, like Narducci himself, were concerned about that breach in confidentiality (id. ¶18; Narducci Dep. 84-85, 91-92).

After receiving Narducci's memo, Moore instructed Modrow to disconnect the Finance Department phone lines from the recording equipment (D. St. ¶286). Moore understood the lines to have been disconnected sometime in March 2000, and to his knowledge they were never reconnected (id. ¶291). According to Modrow, however, the lines remained connected at least until he left Bellwood in February 2002 (N. Add. St. ¶¶75, 161). On February 28, 2001 Narducci filed this action.

### Unknown Trustees and Employees of Bellwood

Narducci's Complaint initially alleged wrongdoing not only by named defendants Moore, Lemm and Bellwood but also by "unknown trustees and employees" of Bellwood. Narducci's responsive

8

memorandum, however, has now voluntarily--and properly--dismissed those claims, for he has failed to name any such additional trustees or employees within the applicable statute of limitations.

## Claims Under 42 U.S.C. §1983

Narducci charges that each of the remaining defendants is liable under 42 U.S.C. §1983 ("Section 1983"). Although not itself a source of substantive rights, Section 1983 provides a remedy where (1) there has been a violation of constitutional or other federal rights and (2) those rights were violated by a person acting under color of state law (Hanania v. Loren-Maltese, 212 F.3d 353, 356 (7th Cir. 2000)). Here Narducci's predicate for the alleged Section 1983 violation is the taping of calls on the Finance Department's phone lines, which he claims constituted an unreasonable search in violation of the Fourth Amendment. While defendants raise a variety of counterarguments that they claim entitle them to dismissal, none of those arguments warrants such a result.

### 1.  Moore's Liability

Moore first contends that he cannot be held liable under Section 1983 because he "had no involvement whatsoever with the taping of the finance department telephone lines" (D. Mem. 5). Moore notes in particular that he had no role in or knowledge of either the initial decision to tape calls on those phone lines or

9

the implementation of that decision.[5]

To be sure, Section 1983 liability "require[s] personal involvement in the alleged constitutional deprivation" (Palmer v. Marion County, 327 F.3d 588, 594 (7th Cir. 2003)). At first blush, then, the fact that Moore had no direct role in the initial approval or implementation of the taping might indeed suggest that he cannot be held liable. But that standard is not applied as strictly as its language--and Moore--might suggest.

In fact, "direct participation in the deprivation [of a constitutional right] is not required" (Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir. 1986), quoting Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985)). Instead "[a]n official satisfies the personal responsibility standard of section 1983 if [he] acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights" (Rascon, 803 F.2d at 274). It is enough for a defendant to have "know[n] about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye" (Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995), quoting Jones v. City of Chicago, 856 F.2d 985, 992 (7th

---

[5]  Defendants' R. Mem. 2-3 also suggests that Moore is not liable because even if he was aware of the taping he "had no knowledge that the taping was illegal." That contention really previews his qualified immunity defense that is addressed later. For now it suffices to note that qualified immunity "focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question" (Erwin v. Daley, 92 F.3d 521, 525 (7th Cir. 1996)).

Cir. 1988)).

Here, while Moore may not have been involved in initiating the taping, he admits that he had been told that there was taping going on even before he took office. Yet after Moore became Chief of Police, he took no action to stop the taping,[6] nor did he even bother to confirm whether it was actually happening. These facts certainly raise a genuine question as to whether Moore acted (or failed to act) with deliberate indifference or "turned a blind eye" to the taping, and summary judgment as to Narducci's Section 1983 claim on this ground must therefore be denied.

## 2. Qualified Immunity

Next both Lemm and Moore assert that they are entitled to "qualified immunity" from Narducci's Section 1983 claims. That defense offers protection "where an official's duties legitimately require action in which clearly established rights are not implicated," so that "the public interest may be better

---

[6] What is said here, consistently with the obligation to treat disputed matters most favorably to nonmovant Narducci, operates on the premise that Moore was empowered to stop the taping. On that score all that has been submitted by the parties is the testimony of Lemm, Frascone and Moore reflecting their respective opinions--but without any grounding in the kind of objective evidence (a job description or a course of conduct or what have you) that would produce a reliable decision (see, e.g., Riley v. Blagojevich, 425 F.3d 357, 364-65 (7th Cir. 2005)). As will be seen later in this opinion, that divergence in the witnesses' understandings leads to different treatment of another of Narducci's claims.

11

served by action taken with independence and without fear of consequences" (Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982) (internal quotation marks and citation omitted)). Once a defendant has raised a qualified immunity defense, plaintiff bears the burden of demonstrating that such immunity is not applicable (Erwin, 92 F.3d at 525).

In assessing such a defense, a court must generally undertake a two-step evaluation. First it must determine whether the facts, taken in the light most favorable to the plaintiff, demonstrate that defendant's actions amounted to a violation of a federal right (Saucier v. Katz, 533 U.S. 194, 200-01 (2001)). If such a violation has taken place, the court must determine whether that right was "clearly established" (id.). As discussed below, Narducci has succeeded in demonstrating both the violation of a federal right and that the right was "clearly established."

A. Violation of a Federal Right

Narducci asserts that Lemm and Moore violated his rights under the Fourth Amendment, which "protects people from unreasonable government intrusions into their legitimate expectations of privacy" (United States v. Chadwick, 433 U.S. 1, 7 (1977)). In most cases "reasonableness" requires that a search be conducted pursuant to a judicial warrant issued upon probable cause (Skinner v. Ry. Labor Executives Ass'n, 489 U.S. 602, 619 (1989)). But when a government employer conducts a search of an

12

employee's "workplace"--defined as "includ[ing] those areas and items that are related to work and are generally within the employer's control" (O'Connor v. Ortega, 480 U.S. 709, 715 (1987) (plurality opinion)) for "work-related" purposes, such as "to retrieve government property or to investigate work-related misconduct" (Gossmeyer v. McDonald, 128 F.3d 481, 490 (7th Cir. 1997)), neither a warrant nor probable cause is required (id.). Such searches are instead lawful as long as they are "reasonable[ ] under all the circumstances" (Shields v. Burge, 874 F.2d 1201, 1203 (7th Cir. 1989), quoting O'Connor). And reasonableness in that context depends upon (1) whether the action was "justified at its inception" and (2) whether it was "reasonably related in scope to the circumstances that prompted the search" (Gossmeyer, 128 F.3d at 490 (internal quotation marks and citation omitted)).

There is no doubt that the taping of Finance Department phone calls qualifies as a "work-related workplace search." Certainly the Finance Department phones, no less than a desk or filing cabinet, are "items related to work and are generally within the employer's control" (see Gossmeyer, 128 F.3d at 490). And as Katz v. United States, 389 U.S. 347, 353 (1967) teaches, the recording of oral conversations is no less governed by the Fourth Amendment than rifling through a desk drawer.

By the same token, all of the claimed reasons for such

13

recording would qualify as "work-related." In general, work-related searches are those "focused primarily on the need to complete the government agency's work in a prompt and efficient manner," rather than on pursuing a particular criminal investigation (O'Connor, 480 U.S. at 721 (plurality opinion)). Each of the suggested reasons for taping--ending the intimidation of Finance Department employees by customers and reducing employee misconduct, either in terms of excessive personal calls or rude and unprofessional behavior--clearly fits that description.

But even under the less rigorous reasonableness standards that govern work-related workplace searches, Narducci has tendered enough evidence to support a ruling that Lemm and Moore's actions violated his Fourth Amendment rights. Defendants do appear to have had a number of legitimate justifications for initiating the recording scheme, such that the first element of "reasonableness" is met. But they fail to satisfy the second element of reasonableness, for "the measures taken by [them]" were not "reasonably related to the search's objective," and they were "overly intrusive" (Gossmeyer, 128 F.3d at 491).

For example, as to the primarily asserted purpose of addressing threats to Finance Department employees, no justification has been offered for the failure to notify the employees (and perhaps the parties to whom those employees were

14

speaking as well), or at least Narducci as department head, that the calls were being recorded. That analysis would apply with at least equal force to the recording of outgoing calls. Nor would there seemingly be a need to have continued the taping long after employees stopped reporting any threats.

As for the other claimed goal of curbing employee misfeasance, either in terms of customer service or excessive personal calls, no justification has been suggested for the failure to inform employees or their supervisor Narducci of the taping--instead notification would play a positive role, that of potential deterrence. And again there would seem to be no reason to extend the taping well after any complaints of rudeness by employees had stopped. Finally, that suggested purpose is negated by the total failure to review the recordings so that any misbehaving employees could be identified and dealt with.

In sum, sufficient evidence supports the likelihood that the scope of the search conducted here, though perhaps originally justified by legitimate government interests, later exceeded the needs of those interests and so violated Narducci's Fourth Amendment rights. This opinion turns then to the second branch of the qualified immunity analysis.

B. Clearly Established Law

Once a constitutional violation has been identified, the dispositive question for a qualified immunity defense is whether

15

the law was "clearly established" when the official acted, such that a reasonable official would know that his conduct was unlawful (Saucier, 533 U.S. at 201-02). To that end a plaintiff must "point to closely analogous cases" or show that the right is "so clear...that no one thought it worthwhile to litigate the issue (Dunn v. City of Elgin, 347 F.3d 641, 650 (7ᵗʰ Cir. 2003), in part quoting Brokaw v. Mercer County, 235 F.3d 1000, 1022 (7ᵗʰ Cir. 2000)). That requires a showing of more than a mere "broad general proposition" (Saucier, 533 U.S. at 201). Instead "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" (Anderson v. Creighton, 433 U.S. 635, 640 (1987)).

In those terms Moore's and Lemm's invocation of qualified immunity must be rejected. Two earlier-cited cases from our Court of Appeals (Shields, 874 F.2d at 1203-04 and Gossmeyer, 128 F.3d at 490-91)--each of them decided well before the events at issue here--clearly adopted O'Connor's two-prong "reasonableness" test for work-related workplace searches, expressly including the requirement that the measures taken must be "reasonably related" to the purposes behind the search. While Gossmeyer, 128 F.3d at 491, involving a search of an employee's desk and filing cabinet,

16

did in the end find the search to have been "reasonable in scope," the court conspicuously noted that the search was narrowly focused, specifically targeting only those places where the items being sought would likely be found (id.). As for Shields, although it did not in the end decide whether the search there was reasonable,[7] the court did take pains to note its disfavor of, and the likely unreasonableness of, searches that were mere open-ended "fishing expedition[s]" undertaken long after an investigation had failed to bear fruit (874 F.2d at 1204-05).

As Gossmeyer, 128 F.3d at 496 observed in its discussion of qualified immunity, "there is surprisingly little case law" addressing just what counts as reasonable conduct in work-related workplace searches.[8] This case adds to the mix a situation in which it is plain that no reasonable officer could have believed

---

[7] Shields, 874 F.2d at 1205-06, which also involved the search of an employee's desk, actually dismissed the plaintiff's Fourth Amendment claims on qualified immunity grounds. But at that time, unlike the relevant time in this case, O'Connor had not yet established the requirements for workplace searches.

[8] Oddly, Gossmeyer, 128 F.3d at 495-97 addressed qualified immunity despite the court's having held that there had been no constitutional violation to begin with. While Gossmeyer found that qualified immunity would have applied had it been necessary to resolve that issue, the question there was whether defendants had been reasonable in assuming that all their search required was O'Connor "reasonableness" instead of some more rigorous standard (id. at 496-97). Here the issue is rather whether, in applying the O'Connor standard, defendants could reasonably have thought their search was "reasonably related" to the justifications for that search.

that the taping scheme was reasonably related to its purported purposes. To recap the bidding, none of the rationalizations voiced by defendants could reasonably justify the lack of notice,[9] the indiscriminate taping of both incoming and outgoing calls and the maintenance of the scheme well after the complaints and threats had ceased. Defendants' failure ever to review, let alone to use, the products of that scheme only further underscores its obviously unnecessarily broad and intrusive contours.

In an attempted defense of their qualified immunity claims, each of Moore and Lemm contends that it was not clear that Narducci would have had a "reasonable expectation of privacy" in the workplace, so that their search thus would not have been illegal. But even if that were so (a doubtful proposition in any event), Shields, 874 F.2d at 1203-04 and Gossmeyer, 128 F.3d at 490-91 make it plain that although the absence of an expectation of privacy may make a warrant and probable cause unnecessary, such absence does not alter the requirements of O'Connor's reasonableness standard.

---

[9] D. R. Mem. 4-5 does briefly claim that Moore had reason to think the taping was legal because "based on his own experience, [he] believed that notice was given that the lines were being recorded via use of an audible signal on the phone line." But defense counsel have to know better: They cite no evidentiary support, nor does their LR 56.1 filing justify any statement either that Moore believed that the employees had notice or that he believed there was a signal on the line.

18

Moore also argues that he could reasonably have presumed his actions not to violate the Fourth Amendment because they were legal under a federal statute--Title III. To begin with, his premise of Title III legality is simply wrong (a subject addressed later). But even were that not so, the contention is certainly unreasonable when advanced in the face of the directly relevant and already cited Fourth Amendment precedent to the contrary.[10]

## 3. Municipal Liability

Monell v. New York Dep't of Soc. Servs., 436 U.S. 658, 690 (1978) established that municipalities are considered "persons" for Section 1983 purposes and can therefore be subjected to Section 1983 liability. But that liability must be direct and not vicarious--Monell, id. at 694 teaches that the municipality "may not be sued under §1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

---

[10] Nor can Moore and Lemm draw any comfort from their appeals to Amati v. City of Woodstock, 165 F.3d 952 (7th Cir. 1999) and Abbott v. Village of Winthrop Harbor, 205 F.3d 976 (7th Cir. 2000). Neither case clarified or modified the principles previously established by O'Connor, Gossmeyer and Shields. Indeed, Amati does not even discuss the constitutional claim, for that part of the verdict was not challenged on appeal (176 F.3d at 954), and Abbott, 205 F.3d at 981-83, while mentioning the underlying constitutional violation, does so in only the most perfunctory manner before quickly moving on to focus on municipal liability.

19

official policy, inflicts the injury that the government as an entity is responsible under §1983." In that respect Abbott, 205 F.3d at 981 has reconfirmed three possible bases for municipal liability under Section 1983:

(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

Here Narducci has provided sufficient evidence that the taping scheme could "fairly be said to represent official policy," as Monell requires, by demonstrating that the taping was an "express policy." Both Mayor Lemm and the Bellwood Board--who together set Bellwood policy--expressly authorized the taping of Finance Department phone calls. Hence Bellwood itself as well as the individual defendants must face the Section 1983 music.[11]

## Title III Claims

As stated at the outset, Narducci also charges that Moore and Lemm violated Title III, which in part provides a civil remedy against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept

---

[11] N. Mem. 12-14 also asserts that the taping constituted "a custom and practice with the force of law" and that the taping was devised and implemented by "individuals with final policy making authority." Those alternative grounds appear persuasive as well, but they need not be explored fully under the circumstances.

or endeavor to intercept, any wire, oral, or electronic communication" (18 U.S.C. §2511(1)(a)[12]). Protecting the privacy of individuals "was an overriding congressional concern" in enacting Title III (Gelbard v. United States, 408 U.S. 41, 48 (1972)), and to effectuate that purpose Section 2511 instituted a stringent standard for wiretaps, foreclosing their use unless explicitly excepted.

In response to Narducci's Title III claims, Moore and Lemm have raised several defenses, contending that qualified immunity again applies, that Moore lacked the requisite intent and that the complained-of actions fall under both the "law enforcement" and "consent" exceptions to Title III liability. Analysis shows, however, that none of those arguments warrants dismissal of Narducci's Title III claims.

## 1. Qualified Immunity

Defendants' reply memorandum raises, for the first time in the Rule 56 proceeding, a qualified immunity defense to Narducci's Title III claims. While our Court of Appeals (see Davis v. Zirkelbach, 149 F.3d 614, 618 (7th Cir. 1998)) does appear to agree with the Eleventh Circuit (Tapley v. Collins, 211 F.3d 1210, 1216 (11th Cir. 2000)) and Sixth Circuit (Blake v. Wright, 179 F.3d 1003, 1013 (6th Cir. 1999) that qualified

---

[12] Further citations to Title III will take the form "Section --," omitting the repeated reference to 18 U.S.C.

immunity may protect an official from Title III liability, defendants' belated presentation of that defense does not merit consideration.

This 5-1/2-year-old action is by a comfortable margin the oldest actively litigated lawsuit on this Court's calendar. Defendants' Answer to Narducci's Complaint was filed in August 2001, when they were of course obligated to assert any affirmative defenses[13]--and one such defense advanced at that time was that of qualified immunity under Title III. Years then elapsed while the parties were engaged in extended and hotly contested discovery and class action issues, after which defendants launched their current Rule 56 motion on September 16, 2005, followed by a series of requests on Narducci's part for extensions of his time to respond. Yet no qualified immunity defense as to Narducci's Title III claim was advanced in defendants' opening presentation seeking summary judgment. Only after Narducci had filed his Rule 56 response on May 30, 2006 (eight months after defendants' opening gun) did defendants attempt to inject qualified immunity into the case as a live issue via their June 27 reply.

Our Court of Appeals has regularly held (see, e.g., Porco v.

---

[13] In that respect it should be remembered that the purpose of a qualified immunity defense, as expressed in the seminal Harlow v. Fitzgerald opinion, is to spare a defendant not only the burden of going to trial but also the burden of having to defend the litigation to begin with (457 U.S. at 817-18 & n.29).

22

Trs. v. Ind. Univ., 453 F.3d 390, 395 (7th Cir. 2006) and Hart v. Transit Mgmt. of Racine, Inc., 426 F.3d 863, 867 (7th Cir. 2005)(per curiam)) that parties who raise arguments for the first time in a reply memorandum rather than in their initial submission--thereby denying the opposing party an opportunity to respond--are deemed to have waived (or, more accurately, forfeited) those arguments. That principle has extra force here, for defendants were obviously aware of the concept of qualified immunity (their initial Mem. 10-11 raised that defense as to Narducci's Section 1983 claims), yet they said not a word on that score in the context of Title III. Under the circumstances that potential defense has been forfeited and will not be entertained.

2. Moore's Intent

As Moore points out, liability under Section 2511(1)(a) depends on defendant's having "intentionally" intercepted a communication. In other words, the interception "must have been the result of defendant's conscious objective rather than the product of a mistake or an accident" (United States v. Townsend, 987 F.2d 927, 930 (2d Cir. 1993)). That does not, however, require any intent to violate the law, or even any knowledge that the interception would be illegal (Earley v. Smoot, 846 F.Supp. 451, 453 (D. Md. 1994)). Nor is an affirmative act, rather than an omission, required. It is enough to be aware that such interception is occurring and to fail to stop it (see Abraham v.

County of Greenville, 237 F.3d 386, 392 (4th Cir. 2001)).

Even though Moore had no role in the initial taping decision or the initial implementation of the taping scheme, Narducci has provided evidence, which must be credited for this purpose, (1) that Moore later became aware of that scheme, (2) that he had the power to stop it and (3) that he failed to do so. That adequately supports an inference that Moore's action, or failure to act, was "intentional" under Section 2511(1)(a). Summary judgment as to the Title III claim on that ground must be and is denied.

3. "Law Enforcement" Exception

Defendants also contend that recording the Finance Department phone calls qualifies for the "law enforcement exception" under Section 2510(5)(a)(ii). Under that exception the recording of communications "by an investigative or law enforcement officer in the ordinary course of his duties" does not give rise to Title III liability. But a communication is not viewed as having been recorded in the "ordinary course" of an officer's duties if it is done to further a particular investigation or target a particular individual (Amati, 176 F.3d at 955-56). Instead it must be part of a "routine noninvestigative recording" of communications (Amati, 176 F.3d at 955). For example, the routine taping of all calls into and out of a police station (id.) or the taping of all prison inmates'

calls (<u>United States v. Feekes</u>, 879 F.2d 1562, 1565-66 (7th Cir. 1989)) has commonly been held to come within that exception.

Here the actual recording was carried out by police officer Modrow, and the phone lines were connected to the 911 emergency system (which was located in, and overseen by, the Police Department). Nevertheless, as explained below, the recordings were not conducted in the "ordinary course" of law enforcement duties as understood in this context, so that the law enforcement exception does not insulate defendants against liability.

To the extent that the recording was done in an effort to check up on asserted misbehavior by Finance Department employees, it plainly did not come under the rubric of law enforcement. It involved Finance Department lines rather than prison or police department lines. Relatedly, the recording was done at the request of the head of the Finance Department rather than of a law enforcement official, and the recording was done for a specific <u>non</u>-law-enforcement purpose. Nothing about Modrow's involvement or the hookup to the 911 system changes that analysis.

As for the alternative basis proffered for the recording--as part of an investigation of threats made against Finance Department employees (a basis about which Narducci has certainly raised a genuine question of fact in any case)--it too does not qualify for the law enforcement exception. While such recording

25

might be said to be related to law enforcement, it would also be precisely the sort of targeted "investigative" recording that does not fall under the exception. As Amati, 176 F.3d at 955 points out, if interceptions used for particular criminal investigations could qualify under the law enforcement exception, much of Title III's protections would be eviscerated, a result that "was surely not Congress' intent."

4. Consent Exception

Title III also expressly provides that interceptions by a person acting under color of law are "not unlawful...where...one of the parties to the communication has given prior consent to such interception" (Section 2511(2)(c)). Such consent need not be explicit, but may rather be implied from "actual notice" of the interception (Amati, 176 F.3d at 955). In other words, someone who makes calls despite knowledge that they are being intercepted is considered to have consented to the interception (United States v. Von Poyck, 77 F.3d 285, 292 (9th Cir. 1996)). To that end "[a] party may consent to the interception of only part of a communication or to the interception of only a subset of its communications" (In re Pharmatrak, Inc., 329 F.3d 9, 19 (1st Cir. 2003)).

Here Narducci has testified that he first found out that Finance Department phone calls were being recorded on February 28, 2000. While Narducci may well have taken "immediate

26

steps inconsistent with consent to the taping" (such as ceasing

to make "confidential or private calls" from Finance Department

phones while also (1) demanding that the taping cease and

(2) informing the FBI and the State's Attorney), any post-

discovery calls he may have made were instituted with the

knowledge that they were being taped, thus arguably falling under

the consent exception to Title III liability. Even under that

view, of course, any recordings of Narducci's calls made before

that date can enjoy no such protection.[14]

## State Law Claims

In addition to his federal claims, Narducci has asserted

both that defendants violated the Eavesdropping Act and that they

tortiously intruded into his "seclusion" in violation of Illinois

common law. In response defendants have argued (1) that Moore's

lack of "any knowledge whatsoever" about the recording of Finance

Department phone calls precludes liability under the

Eavesdropping Act, (2) that Narducci has failed to establish all

the elements of an intrusion-upon-seclusion claim and (3) that in

any case the Illinois Local Government and Governmental Employees

Tort Immunity Act ("Immunity Act")(745 ILCS 10/1-101 to 10/10-

101) insulates Moore and Lemm from liability for both alleged

---

[14] Narducci points out accurately that the consent
standards would apply equally to the interceptions of calls to or
from "vendors, citizens, employees and other" class members, so
that any calls in which neither party was aware of the
interception would not qualify for the consent exception.

state offenses.[15] As discussed below, summary judgment on the state law claims is ultimately granted as to both Lemm and Moore.

1.  Eavesdropping Act[16]

Just as in the Section 1983 and Title III contexts, Moore's contentions as to lack of knowledge of the recording are misplaced. Certainly he is correct that the Eavesdropping Act requires an eavesdropper to have acted "knowingly and intentionally" (720 ILCS 5/14-2). But this opinion has already referred to evidence that Moore knew about the recording when he became Chief and that, despite his assertedly having the power to stop it, he did not do so. Such failure to act in those circumstances would once again support a reasonable inference that Moore's omission was "intentional" and thus within the Eavesdropping Act's prohibition.

From that perspective alone, then, Narducci would succeed in staving off summary judgment on his Eavesdropping Act claim against Moore. But as n.6 has foreshadowed, such a potential victory is Pyrrhic indeed, for it would compel Narducci's loss on that claim because it is hereafter shown that Moore would then prevail on immunity grounds. Hence a ruling on the subject just

---

[15]   As D. R. Mem. 5 acknowledges, the Immunity Act "has no bearing on [Narducci's] federal claims."

[16]   Because Lemm has raised no issue under the Eavesdropping Act, instead relying solely on the Immunity Act (discussed later) for his defense to the state law claims, the next paragraph of the text deals only with Moore.

discussed must be held in suspension until the analysis in the Immunity Act section of this opinion is completed.

2.  Tortious Intrusion into the Seclusion of Another

According to Lovgren v. Citizens First Nat'l Bank of Princeton, 126 Ill.2d 411, 417, 534 N.E.2d 987, 989 (1989), an intrusion upon seclusion involves at its core "the offensive prying into the private domain of another" (see also Restatement (Second) of Torts §652B). To sustain such a claim a plaintiff must establish (Schmidt v. Ameritech Ill., 329 Ill.App.3d 1020, 1030-31, 768 N.E.2d 303, 312 (1st Dist. 2002)):

> (1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is offensive or objectionable to a reasonable person;[17] (3) the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering.

In this instance defendants urge that Narducci has failed to provide evidence either that the intrusion was sufficiently "offensive" or that it caused "anguish and suffering." But the evidence adduced by Narducci, together with the required reasonable inferences in his favor, preclude summary judgment on this claim.[18]

---

[17]    [Footnote by this Court]  Later on the same page Schmidt confirms "that the standard of conduct to which this tort applies is highly offensive" (emphasis in original).  This opinion will of course adhere to that standard.

[18]    Moore also raises the argument, although briefly, that his lack of knowledge of the taping also precludes liability, given that an "intrusion upon seclusion" must be done

Defendants' contention that the taping of Finance Department phone calls is not sufficiently--that is, "highly"--offensive can be quickly dispensed with. Eavesdropping via wiretapping has been conspicuously singled out on several occasions as precisely the kind of conduct that gives rise to an intrusion-on-seclusion claim (see, e.g., Lovgren, 126 Ill.2d at 417, 534 N.E.2d at 989; Thomas v. Pearl, 998 F.2d 447, 452 (7th Cir. 1993); Restatement (Second) of Torts §652B cmt. b).

Nor can it be said that Narducci has provided insufficient evidence of "anguish and suffering." To satisfy that element Narducci must show that the intrusion itself caused an "actual injury in the form of, for example, medical care, an inability to sleep or work, or a loss of reputation and integrity in the community" (Schmidt, 329 Ill.App.3d at 1035, 768 N.E.2d at 316). As the following discussion reflects, a trier of fact could reasonably so conclude.

To begin with, Narducci (whose testimony must be credited at this point) has sworn that he found the taping "objectionable" and that he, like one of the plaintiffs in Schmidt (see id. at 1036-37, 768 N.E.2d at 317), stopped using work phones for his private calls, particularly his confidential business calls to

_____

intentionally to be actionable (Restatement (Second) of Torts §652B). But just as in the Eavesdropping Act context, any contention as to the absence of intentional action on Moore's part fails.

30

his other clients, once he discovered the intrusion.

In that respect Narducci testified that he was concerned in particular about the recording of those private confidential calls with his other clients, and he added that those other clients were themselves concerned about the breach of confidentiality. Such evidence could certainly allow a factfinder to infer that Narducci had suffered a "loss of reputation and integrity in the community." This evidentiary showing--though arguably (as in Schmidt, id.) "a bit thin"--would be enough to raise a genuine question of fact and would thus require the denial of summary judgment.

But what has been said as to Moore's potential liability or nonliability under the Eavesdropping Act applies with equal force to Narducci's common law claim. So here too a suspension of judgment is called for pending the following analysis as to the Illinois Immunity Act.

3. Immunity Act

Both Lemm and Moore invoke 745 ILCS 10/2-201 ("Section 2-201") to seek statutory immunity from Narducci's state law claims:

Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting form his act or omission in determining policy when acting in the exercise of such discretion even though abused.

As that language suggests, "section 2-201 immunity is concerned

31

with both the position held by the municipal employee and the action performed by that employee" (Arteman v. Clinton Cmty. Sch. Dist. No. 15, 198 Ill.2d 475, 484, 763 N.E.2d 756, 763 (2002)). In those respects the employee must "hold[ ] either a position involving the determination of policy or a position involving the exercis[e of] discretion," and the plaintiff's injury must "result[ ] from an act performed or omitted by the employee in determining policy and in exercising discretion" (Harinek v. 161 N. Clark St. Ltd. P'ship, 181 Ill.2d 335, 341, 692 N.E.2d 1177, 1181 (1998)(emphasis in original)).

Discretionary acts are those that "involve the exercise of personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed" (Wrobel v. City of Chicago, 318 Ill.App.3d 390, 394-95, 742 N.E.2d 401, 405-06 (1st Dist. 2000)). In contrast, "ministerial acts" are "those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act" (Harinek, 181 Ill.2d at 343, 692 N.E.2d at 1182, quoting Snyder v. Curran Twp., 167 Ill.2d 466, 474, 657 N.E.2d 988, 993 (1995)).

Discretionary acts must further be "unique to a particular public office," so that for example a state trooper's judgments as to which route to take and how fast to drive when responding

to an emergency call are not "discretionary" decisions because they are not unique to the trooper's position but are made by all drivers (Currie v. Lao, 148 Ill.2d 151, 167, 592 N.E.2d 977, 984 (1992)). Policy-determining acts, on the other hand, "require... [an] employee to balance competing interests and to make a judgment call as to what solutions will best serve each of those interests" (Harrison v. Hardin County Cmty. Unit Sch. Dist. No. 1, 197 Ill.2d 466, 472, 758 N.E.2d 848, 852 (2001)). In applying those standards Illinois courts have found that a fire marshal's actions in planning and conducting a fire drill (Harinek, 181 Ill.2d at 342-43, 692 N.E.2d at 1181-82), a shop teacher's removal of a safety shield from a table saw (Courson v. Danville Sch. Dist. No. 118, 333 Ill.App.3d 86, 91, 775 N.E.2d 1022, 1026 (4th Dist. 2002)) and even the filling of potholes by city maintenance workers (Wrobel, 318 Ill.App.3d at 394-96, 742 N.E.2d at 405-07) all qualified as both exercises of discretion and determinations of policy.

Once the dual criteria have been met, the immunity bestowed by Section 2-201 is absolute, extending even to "willful and wanton" actions by an employee. While Illinois courts at one time interpreted Section 2-201 immunity to contain such an exception, that line of cases has been explicitly overruled by In re Chicago Flood Litig., 176 Ill.2d 179, 196, 680 N.E.2d 265, 273 (1997).

33

In this case both Mayor Lemm and Chief of Police Moore held positions that plainly involved both the exercise of discretion and the determination of policy for Section 2-201 purposes. Lemm set ultimate Bellwood policy (along with the Board) and exercised discretion, such as in running Bellwood's day to day operations and in appointing trustees to the Finance Committee. Moore had both the authority to "enact police policies and procedures" and to exercise discretion in directing the activities of Police Department employees.

At least in Lemm's case, the action alleged to have caused Narducci's injury--the authorization of the recording of Finance Department phone calls--was certainly both discretionary and a policy determination under Section 2-201. In deciding to authorize the taping, Lemm had to balance the interests that prompted the recording against the privacy of Finance Department employees and the cost in resources, time and money that such a program would require. Furthermore, Lemm's authorization could hardly be said to have been given "in obedience to the mandate of legal authority" (Harinek, 181 Ill.2d at 343, 692 N.E.2d at 1182). And it was Lemm's job as Bellwood's CEO to exercise his judgment in deciding among potential courses of action and to authorize the one he thought best. In sum, Lemm's authorization of the recording was surely both discretionary and policy-determinative, so that Section 2-201 provides him with immunity

from Narducci's state law claims.

Moore's entitlement or disentitlement to immunity calls for a more complex analysis. In his case it is the failure to stop the recording that Narducci alleges caused his injury. But in order to lose the possible benefit of the state-decreed statutory immunity in that respect, Moore would have to lack the authority to order the recording to be stopped--after all, it would be necessary that he possess such authority to begin with before his failure to act in that regard could be the result of an "exercise of personal deliberation and judgment" (Wrobel, 318 Ill.App.3d at 394-95, 742 N.E.2d at 406). In the absence of such authority (and only in the absence of such authority), Moore's bid for Section 2-201 immunity would have to be denied.

But that would impale Narducci on the other horn of a dilemma. It will be recalled that both the Eavesdropping Act and the state common law claim share the requirement that Moore's inaction--his failure to stop the recording of phone calls--had to be intentional. But if Moore lacked the authority to do so (which is the just-stated precondition to Narducci's escaping the clutches of the Immunity Act), Moore cannot be tagged with an "intentional" failure in that regard--and that would directly spell doom for both of Narducci's state law claims. Hence whatever view is taken as to Moore's authority or lack of it, Narducci's state law claims against him succumb as a matter of

35

law.

## Conclusion

This opinion's lengthy analysis has revealed genuine questions of material fact as to many of the issues in this case. This Court therefore denies defendants' Rule 56 motion except as to (1) Narducci's state law claims against both Lemm and Moore and (2) any Title III claims based on calls made after Narducci became aware that those calls were being recorded.

Two other matters have been brought into sharp focus by the current analysis and the related question of "where do we go from here?":

 1. It has become clear that Narducci's evidence has not only proved sufficient to prevent defendants from prevailing on summary judgment but has also raised serious questions--at a minimum--as to defendants' ultimate ability to prevail at trial, particularly as to Lemm's and Bellwood's liability under Section 1983.[19]  Counsel should be prepared to discuss that subject at the next status hearing.

---

[19]  This opinion has repeatedly stressed that it has credited Narducci's version of the facts for present purposes (Narducci did not counter with a cross-motion for summary judgment, so this opinion was not called upon to adopt a Janus-like dual perspective as to any disputed factual matters).  But the Background section of this opinion does not appear to suggest that any inference drawing, let alone any resolution of differing views of the facts, is needed to establish Narducci's entitlement to prevail on his claims that have survived the current motion.

2. As to the class members whom Narducci represents, any rulings against defendants that may hereafter follow under the circumstances referred to in Paragraph 1 may give rise to offensive issue preclusion. Whether or not such is the case, counsel for the parties are also expected to discuss the procedure and timing for addressing the class claims.

Finally, this action is set for a status hearing at 8:45 a.m. August 22, 2006.

Milton I. Shadur
Senior United States District Judge

Date: August 11, 2006